UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHANDRA A. NEAL,

                             CASE NO. 18-10709

        *Plaintiff*,              DISTRICT JUDGE THOMAS L. LUDINGTON
*v.*                         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 12, 17)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff Chandra Neal is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 12), be **DENIED**, the Commissioner's Motion, (R. 17), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Referral, (R. 3), this case was referred to the undersigned Magistrate Judge to review the final decision of the Commissioner denying Plaintiff's claim for Disability Insurance Benefits. The case is presently before the Court upon the parties' cross-motions for summary judgment. (R. 12, 17.)

1

In a prior application for Title II Disability Insurance Benefits (DIB) and Title XVI Supplemental Security Income (SSI), Administrative Law Judge (ALJ) Janet Alaga-Gadigian found Plaintiff disabled from April 28, 2011 through April 23, 2014, but not disabled after that date. (R. 9, PageID.104.)

Plaintiff then filed the present application for DIB on March 12, 2015, alleging that her disability began August 31, 2014. (R. 9, PageID.180.) The Commissioner denied the claim. (R. 9, PageID.120.) Plaintiff then requested a hearing, which occurred in front of ALJ Patricia McKay on November 30, 2016. (R. 9, PageID.52-84.) The ALJ issued a decision on February 21, 2017, finding Plaintiff not disabled during the relevant period. (R. 9, PageID.38-47.) On February 7, 2018, the Appeals Council denied review, (R. 9, PageID.29-31), and Plaintiff filed her complaint in court on March 1, 2018, (R. 1.) She then filed the instant Motion for Summary Judgment on June 11, 2018, (R. 13), and the Commissioner countered with its own Motion in September, (R. 15). Plaintiff has replied, (R. 18), and the case is now ready for resolution.

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the

> duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§

4

416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). Nonetheless, the claimant must provide evidence establishing the RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 9, PageID.46.) At step one, the ALJ found that the last date Plaintiff could claim insurance for (*i.e.*, the last date of insured status) was December 31, 2018, and that she had not engaged in substantial gainful activity since her alleged onset date of August 31, 2014. (R. 9, PageID.40.)[1] At step two, the ALJ concluded that Plaintiff had the following severe impairments:

> history of peripheral neuropathy, liver disease, chronic pancreatitis, gastritis, hypertension, herpes, carpal tunnel syndrome, generalized anxiety disorder, and major depressive disorder; alcohol abuse with neuropathy and polyneuropathy, degenerative disc disease of the lumbar spine with bulging discs; and bipolar disease.

(*Id.*)[2] At step three the ALJ decided these impairments did not meet or equal a listed impairment. (R. 9, PageID.41.)[3]

---

[1] The prior ALJ's decision determined that Plaintiff had not performed substantial gainful activity since April 28, 2011. (R. 9, PageID.94.)

[2] The prior decision did not find bipolar disease, degenerative disc disease, alcohol abuse with neuropathy and polyneuropathy, or herpes; it did find, however, hepatitis. (R. 9, PageID.94.) Otherwise, the lists are identical.

[3] The prior decision likewise found no disability at step three. (R. 9, PageID.95.)

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual

functional capacity (RFC) to perform

> sedentary work as defined in 20 CFR 404.1567(a) with the following
> additional limitations: occasional crouching, crawling, kneeling,
> stooping/bending, and climbing of stairs; avoid workplace hazards such as
> dangerous moving machinery and unprotected heights; no climbing of ropes,
> ladders, or scaffolds; frequent grasping and gross manipulation with the
> bilateral upper extremities; frequent fingering and fine manipulation with the
> bilateral upper extremities; frequent foot control operation with the bilateral
> lower extremities; low stress work (self-paced and not at a production rate or
> involving team/tandem tasks): occasional contact with others; and simple,
> routine, and repetitive tasks.

(R. 9, PageID.42.)[4] At step four, the ALJ found that Plaintiff had not performed past

relevant work since her previous disability application, which found her unable to perform

any such work; the ALJ followed that prior decision. (R. 9, PageID.45, 100.) Finally, at

step five, the ALJ determined that Plaintiff could perform a significant number of jobs in

the national economy. (R. 9, PageID.45-46.)[5]

---

[4] The prior decision's RFC was as follows:

> [T]he claimant had the residual functional capacity to perform sedentary work . . . except:
> sit/stand option; no push/pull with lower extremities; no foot control operation; no climbing
> ropes/ladders/scaffolds; no more than occasional climbing ramps/stairs; no more than
> occasional balancing, stooping, crouching, kneeling; no crawling; no more than frequent
> fine manipulation; avoid all exposure to hazardous machinery or unprotected heights; avoid
> all exposure to extreme cold/heat and vibration; unskilled jobs with simple, routine tasks;
> no production rate work; no interaction with the general public; occasional, at most,
> interaction with co-workers and supervisors; and 3 or more unexcused or unscheduled
> absences per month on an ongoing basis.

(R. 9, PageID.97.)

[5] As noted, the prior decision found Plaintiff disabled from April 28, 2011 until April 23, 2014. (R. 9,
PageID.101.) However, the previous ALJ found that Plaintiff had improved as of April 24, 2014, and was
no longer disabled. (R. 9, PageID.101-104.)

6

### E.   Administrative Record

#### 1.   Medical Record

Instead of summarizing the medical record here, I will refer to it in the analysis below.

#### 2.   Function Form

With the help of Michael White, a non-attorney representative, Plaintiff completed an adult function form in April 2015 as part of her application for benefits. (R. 9, PageID.54, 234-241.) In it, she claimed that her ability to work was hampered by constant pain, "Attion [*sic*] disorder," bowel issues, pancreatitis, and the inability to stand for long periods, walk well, or grasp and hold objects. (R. 9, PageID.234.) These problems also interrupted her sleep. (R. 9, PageID.235.) During a typical day, she showered, dressed, and attended doctor's appointments; she took her time dressing, needed help bathing, had trouble raising her arms to care for her hair, and sometimes could not "tell if food is in my mouth." (*Id.*) She was responsible for her son, but her mother helped. (*Id.*)

To make it through the day, she needed reminders for personal care (specifically, to make sure her clothes were proper), appointments, and medications. (R. 9, PageID.236.) She could prepare meals, twice a day, such as fruits or cereal for breakfast; no "mutli-course dinners" though, and the preparations took her double the normal time due to hand and finger numbness. (*Id.*) As for other household chairs, she did laundry (with assistance), which took about 1.5 hours twice a week. (*Id.*)

Twice a day she left the house, but not alone and seldom by driving. (R. 9, PageID.237.) Every two weeks, she shopped for groceries, a task that took "a very long

time." (*Id.*) Financial matters, like handling a savings account or counting change, did not present problems, although her numb hands made it difficult to feel bills or pick up change. (R. 9, PageID.237-238.) Her hobbies included television and books, but she struggled to remember what she had read. (R. 9, PageID.238.) Social life consisted of talking to others. (*Id.*)

Her conditions affected various abilities: lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, completing tasks, concentrating, understanding, following instructions, and using hands; but she did not struggle with sitting, talking, hearing, seeing, or getting along with others. (R. 9, PageID.239.) She could walk 100 feet before needing to rest for 15 minutes and could pay attention for up to an hour. (*Id.*) She got along with authority figures well and had never been fired, but she did not handle stress well. (R. 9, PageID.240.) She had been prescribed a leg brace but "it didn't work" and she seldom wore it. (*Id.*)

### 3.   Administrative Hearing

At Plaintiff's November 2016 hearing, she testified that her legs and feet experienced swelling, tingling, stinging, and numbness, which prevented her from working. (R. 9, PageID.57, 59.) Everyday, her feet swelled, relieved only by elevating them above waist-level and taking a nap. (R. 9, PageID.74.) Difficulty with her feet and legs also forced her to take multiple breaks when she walked. (R. 9, PageID.57.) She need breaks during the day, too, while she did chores "off and on." (*Id.*) For example, she could complete one load of dishes but not two—her fingers would grow numb and she would lose her grip. (R. 9, PageID.58.) Her 14-year-old son lived with her and helped with chores,

such as the dishes, vacuuming, and cleaning. (R. 9, PageID.62.) She dropped items a few times each day; more often than she used to. (*Id.*) Her hand issues also impeded her writing—completing a single page could take more than an hour. (R. 9, PageID.59.)

Sitting for six of eight hours in a workday would be impossible, she stated, because her tailbone would hurt and her legs would go numb. (R. 9, PageID.59-60.) When she arose, her balance would be off, compromising her ability to walk. (R. 9, PageID.60.) In the past, she used a cane, but gripping it was difficult. (*Id.*)

Her mental health, too, had worsened, with periods of sadness, and depression, hopelessness, and crying spells twice a week for half an hour each. (R. 9, PageID.60-61.) Three or four times a week she had panic attacks lasting about an hour. (R. 9, PageID.61.) Somedays—about 12 a month—the depression was so severe she could not complete chores and instead laid in bed. (R. 9, PageID.62.) When she grew depressed, she wanted to drink; but since February she had been sober. (R. 9, PageID.63.)

She lived with her son in a two-floor townhouse, with her bedroom upstairs. (R. 9, PageID.65.) Her new application alleged disability as of August 31, 2014, and the ALJ asked what happened on that date. (R. 9, PageID. 66.) "Things got worse. The depression, the symptoms from the neuropathy," she replied. (*Id.*) Specifically, the depression increased, as did the crying spells, anxiety attacks, and difficulty gripping objects. (*Id.*)

For depression, she had tried "a lot of different meds," but for her neuropathy, the medication had not changed much because she had been on the maximum dosage since 2012. (R. 9, PageID.67.) The medication caused drowsiness and jitters; she took about seven or eight naps a week, lasing up to 1.5 hours. (R. 9, PageID.67-68.)

9

She attended her son's parent-teacher conferences about twice per year. (R. 9, PageID.69.) She no longer could focus on books and could not play sports. (R. 9, PageID.70.)

Previously, she had worked as an administrative assistant at a school, but she no longer could perform that work because it required typing and sitting for long periods. (R. 9, PageID.71-72.) Nor could she go back to her sales assistant job at Wal-Mart because she could not remain on her feet for the entire work day. (R. 9, PageID.72.) At most, she could sit for 1 to 1.5 hours before needing to stand. (*Id.*)

Before she filed her present application, she attended school. (R. 9, PageID.73.) But her health problems—particularly her lack of "comprehension"—prevented her from finishing. (*Id.*)

The ALJ then asked the vocational expert ("VE") to consider a hypothetical individual with Plaintiff's age, education, and past work. (R. 9, PageID.76.) The individual could perform a full range of light-exertion work with the following additional limitations:

> She could only occasionally climb stairs, crouch or crawl and kneel or stoop or bend. But she's not able to work near hazards and those would be things such as dangerous moving machinery or working at unprotected heights. So she's not able to climb any ladders or ropes or scaffolding. With her upper extremities, this would be both upper extremities. She could use them for grasping or gross manipulation on a frequent but not constant basis. The same with fingering with those upper extremities, fingering or fine manipulation. And she could use foot controls but only frequently, not constantly. She would be able to tolerate occasional interaction with her coworkers or supervisors or the public. But the work should be simple and routine and repetitive. And should be low stress and low stress means to me that it would be a self-paced job. She's not working at a production rate or in team or tandem with her coworkers.

(R. 9, PageID.76-77.) Such an individual could not perform Plaintiff's past work, the VE

10

testified, but she could perform other jobs: general office clerk (250,000 positions nationally), inspector (180,000 positions), and packager (130,000 positions). (R. 9, PageID.77.) If the same person were limited to sedentary positions, she could work as a general office clerk (150,000 positions), bench assembler (150,000 positions), and an inspector (130,000 positions). (R. 9, PageID.77-78.) All these sedentary positions would allow the individual to sit or stand; but with the sit-and-stand option, the numbers for "light positions" would be reduced to 100,000 for general office clerk and 40,000 for the packager and inspector positions. (R. 9, PageID.78.) The numbers would not be affected if the individual could use foot controls only occasionally. (*Id.*)

But all work would be eliminated if she could grasp or do gross manipulation only occasionally. (R. 9, PageID.78-79.) If, instead, she could only do frequent fingering or fine manipulation, but only occasional gross manipulation, the individual could work as a general office clerk at both the sedentary and light levels. (R. 9, PageID.80.) If she could do frequent grasping or gross manipulation, but only occasional fingering or fine manipulation, she could work as an inspector (at both light and sedentary levels), bench assembler, and packager. (R. 9, PageID.81.)

Any individual who needed frequent, prolonged breaks could not work. (*Id.*) And anything above two absences a month would preclude work. (R. 9, PageID.82.) The need to elevate her legs waist-high would also prevent her from employment. (*Id.*) Finally, taking Plaintiff's testimony at face value, she would not be able to maintain employment. (R. 9, PageID.83.)

11

## F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[6] carve the evidence "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the

---

[6] Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a

13

treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[7] Credibility determinations regarding a claimant's subjective complaints rest with

---

[7] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL

14

the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v.

Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996

WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

confirming that objective medical evidence of the underlying condition exists. The ALJ

then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v.

Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the

extent of the work-related limitations by determining the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

### G.    Analysis

Plaintiff presents three arguments, which I will address in turn.

#### 1.    Res Judicata

Plaintiff contends that the ALJ was bound by the determinations of the prior ALJ

awarding her benefits for a closed period.[8] (R. 12, PageID.856-857.) This argument

---

2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

[8] "'In a "closed period" case, the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision.'" *Gaines v.*

involves the August 2014 decision by ALJ Alaga-Gadigian, which found Plaintiff disabled from April 28, 2011 until April 23, 2014. That decision was based, in part, on various neuropathic maladies that decreased her grip strength and sensation and made walking difficult. (R. 9, PageID.98-99.) In addition, ALJ Alaga-Gadigian noted that Plaintiff lacked energy, offered objective findings supporting her complaints, "required assistance with even minor tasks," and could not drive. (R. 9, PageID.99.)

According to the prior decision, Plaintiff turned the corner on April 24, 2014, and was no longer disabled; in fact, ALJ Alaga-Gadigian determined that the impairments were no longer "severe" on this date. (R. 9, PageID.102-103.) By this point, the prior decision explained, Plaintiff was attending classes and waiting for an internship placement. (R. 9, PageID.102.) This suggested a more robust ability to deal with daily activities. (R. 9, PageID.103.) Further, the record after April 24 simply lacked evidence of continued difficulties. (*Id.*)

ALJ McKay, in the present decision, noted that the prior determinations were generally binding but not here because new evidence demonstrated deterioration. (R. 9, PageID.42.) Plaintiff thinks that ALJ McKay was bound by the previous determination finding disability. (R. 12, PageID.856.) She gets there by noting that the prior ALJ found that her impairments were no longer severe, but ALJ McKay disagreed, finding that they had become severe. (R. 12, PageID.857.) The renewed finding of severity, Plaintiff suggests, is enough to revivify the disability finding by means of *res judicata*. (*Id.*) She

_____

*Comm'r of Soc. Sec.*, No. 1:16-cv-12793, at *8 (E.D. Mich. April 4, 2017) (citation omitted), *rep. & rec. adopted by* 2017 WL 2117990 (E.D. Mich. May 16, 2017).

states, "It is submitted that since Neal's prior severe impairments recurred, the prior RFC of ALJ Alaga-Gadigian that was contained in Finding # 5 of the 2014 decision also recurred, requiring a finding of disabled." (*Id.*) No law is cited to support this result.

Until recently, the leading case on *res judicata* in this Circuit was *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997).[9] There, the court held that the "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997). The Social Security Administration then issued an Acquiescence Ruling on *Drummond*:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (June 1, 1998). This approach, in the context of closed periods of disability, meant that "*res judicata* binds the Commissioner as to the claimant's disability *during* the closed period, as well as her non-disability *after and before* the closed period." *Gaines v. Comm'r of Soc. Sec.*, No. 1:16-cv-12793, at *8 (E.D. Mich. April 4, 2017) (citation omitted), rep. & rec. adopted by 2017 WL 2117990 (E.D. Mich. May 16, 2017).

---

[9] As the Third Circuit has explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel, is less expansive, "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Id.*

Recently—a couple weeks after Plaintiff filed her motion—the Sixth Circuit clarified the meaning of *Drummond*. In *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018), the ALJ had thought *Drummond* precluded him from revisiting an earlier finding that the claimant was not disabled unless she offered new and material evidence of a changed condition. But this belief was incorrect. Rather, the Sixth Circuit explained, "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory condition." *Id.* at 932. As such, *res judicata* does not "prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id.* at 931.

Courts applying *Earley* to ALJ decisions issued before that case—like the one here—have asked whether the ALJ, despite purporting to follow *Drummond*, gave the new evidence a fresh look. If so, then the ALJ's decision satisfied *Earley*; if not, then remand was appropriate. *See Snyder v. Comm'r of Soc. Sec.*, No. 1:17-cv-486, 2018 WL 4658813, at *3 (W.D. Mich. 2018) (finding that the pre-*Earley* ALJ decision satisfied *Earely* by "effectively re-open[ing]" the prior ALJ's decision); *Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at *3 (W.D. Mich. 2018) (reversing where the ALJ did not satisfactorily review the evidence, but rather focused on the prior RFC findings); *Cassaday v. Comm'r of Soc. Sec.*, No. 1:17-cv-630, 2018 WL 4519989, at *3 (W.D. Mich. 2018) (reversing where the ALJ's decision was not consistent with *Earley*'s requirement

of independent review); *Brent v. Comm'r of Soc. Sec.*, Case No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. 2018) (holding that pre-*Earley* ALJ sufficiently conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kamphaus v. Comm'r of Soc. Sec.*, No. 2:17-cv-11828, 2018 WL 3800243, at *5 (E.D. Mich. 2018) ("It is clear to the Undersigned that ALJ Deming did not simply apply *res judicata* principles and adopt ALJ Kalt's findings 'lock, stock and barrel,' but instead gave new consideration and analysis" to the new evidence.), *rep. & rec. adopted by* 2018 WL 3770045 (E.D. Mich. 2018); *see also Kimball v. Comm'r of Soc. Sec.*, No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *rep. & rec. adopted by*, 2018 WL 4095081 (E.D. Mich., 2018).[10]

Plaintiff's reply brief, which notes these developments, presses on as if *Earley* never happened. (R. 18, PageID.912.) She now is a bit more precise, though, contending that since ALJ McKay "failed to discuss the number of absences that Neal would have on a monthly basis, the prior ALJ's finding during the closed period would be indicative of the number of absences, especially in light of Neal's deterioration and worsening of her medical condition." (*Id.*) Accordingly, Plaintiff asserts that *res judicata* binds ALJ McKay

---

[10] One out-of-circuit court declined to apply *Earley* to a preceding ALJ decision, but did not explain why. *See Seabolt v. Berryhill*, 2018 WL 3545382, at *3 at n. 4 (N.D. Ind. July 23, 2016) (finding that "*Earley* had not been decided when the ALJ opined on Seabolt's case and therefore does not control this Court's analysis of the ALJ's decision"); *but see generally* Garner, et al., *The Law of Judicial Precedent* 308-10 (2016) (noting that judicial decisions generally have retroactive effect).

to the prior finding of disability. (R. 18, PageID.912-913.)

Plaintiff offers no support that *res judicata* ever, even pre-*Earley*, required ALJs to pass over the most recent ALJ decisions and instead excavate older ones simply because the impairments are once again severe at step two. A finding of severity at that stage is not tantamount to being declared disabled—it is merely a "'*de minimus* hurdle." *Rogers*, 486 F.3d at 243 n. 2. Thus, even if the ALJ was bound by the earlier step two analysis, the result is not an automatic finding of disability; the claim simply proceeds to step three. 20 C.F.R. § 404.1520(a)(4).

Plaintiff's arguments are cast in pre-*Earley* language about a prior decision's binding effect on subsequent periods. But as *Earley* establishes, ALJs must give a "fresh look" at new applications covering new periods. *Earley*, 893 F.3d at 931-932. The question, then, is whether the ALJ shuffled off the past decision, as she should, not whether she reflexively adhered to it, as she should not. Here, even though the ALJ decided the case before *Earley*, she nonetheless noted that the new evidence of Plaintiff's declining condition rendered the prior decision not binding. (R. 9, PageID.42.) She therefore took a "fresh look" at the evidence, just as *Earley* prescribes.

Plaintiff attempts to find a patch of evidence that the ALJ overlooked, noting that the recent decision does not mention absences from work, but the prior decision did. (R. 14, PageID.912.) Again, however, the prior determination was not binding on subsequent periods. Thus, Plaintiff's real argument can only be that ALJ McKay should have found that Plaintiff would be absent three or more days per month. This is not a *res judicata* argument, but rather one implicating, among other things, Plaintiff's credibility. But she

20

does not frame or develop that argument, and therefore has waived it. *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

For these reasons, I conclude that ALJ McKay was not bound by the prior determination and her analysis appropriately examined the new evidence with fresh eyes. As a result, Plaintiff's more specific argument regarding the number of absences should also be rejected.

### 2.      Hand and Foot Impairments

Plaintiff second argument contains a medley of contentions involving the RFC's limitation to frequent grasping, fingering, and gross/fine manipulation, and frequent use of foot controls. (R. 12, PageID.858.)[11] She claims that substantial evidence does not support the conclusion that she can do these tasks on a "frequent" basis. This is important because, as the VE testified, if she were "limited to occasional . . . grasping or gross manipulation, all jobs would be eliminated." (*Id.*)

The first part of her argument lists evidence of her problems, including her testimony, her other memorialized complaints, and "records from Michigan Neurology confirm[ing] complaints of hand and wrist pain with weakness of grip strength." (R. 12, PageID.859 (citing R. 9, PageID.59, 316, 722, 731, 740, 800, 810, 812.).) The nub of her argument is that the ALJ relied on her ability to do some activities of daily living, but such "sporadic activities . . . are not indicative of an ability to satisfactorily perform work in a

---

[11] Plaintiff's statement of the issue does not mention the foot control limitation, but she addresses it in the body of her argument. (R. 12, PageID.844, 858.)

competitive work setting on a regular and consistent basis." (R. 12, PageID.860 (citing Soc. Sec. Ruling 96-8p).) She then blasts the ALJ for observing that much of her evidence consists of subjective complaints. (R. 12, PageID.862-863.) This is no fault, she contends, because the regulations protect her claims from being rejected simply because they lack objective evidence. (R. 12, PageID.863 (citing 20 C.F.R. § 404.1529(c)(2)).)

As an initial matter, Plaintiff is correct that she often complained of foot and hand numbness, and she was diagnosed with alcohol-induced polyneuropathy. *See, e.g.*, (R. 9, PageID.720, 722.) But the ALJ's characterization of her daily activities is accurate. Her decision states that Plaintiff cared for herself and did housework, continued to drive and shop, and could socialize. (R. 9, PageID.41-42, 44.) The record bears out these assertions. Despite the statements in her function report that she struggled with some personal care, (R. 9, PageID.235), ample evidence exists of her ability to handle daily activities. The report itself notes that she could care for her son with some help, prepare meals, do chores such as laundry, could drive at times, continued to read with some difficulty, and talked to others. (R. 9, PageID.236-238.) She said as much at the hearing. (R. 9, PageID.58, 68-70.) What is more, while a few earlier reports mention decreased attention to daily activities, (R. 9, PageID.589, 754), in the most recent records Plaintiff "report[ed] having enough energy to complete tasks at home, demonstrates appropriate ADL [*i.e.*, activities of daily living] care." (R. 9, PageID.826; *see also* R. 9, PageID.750, 829 (same).) In another report, she said that her level of community involvement was unsatisfying, but that she was able to spend time with family and attend church occasionally. (R. 9, PageID.618.) And she also reported "cleaning her house at odd hours" and clothes shopping. (R. 9, PageID.583.)

22

The question Plaintiff presents, then, is whether this evidence is probative. An RFC is the most an individual can do "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, *2 (July 2, 1996). No doubt, slogging through 40-hour work weeks takes more ability than does occasional grocery shopping, for example. As Plaintiff observes, the Sixth Circuit has warned that "minimal daily functions" like reading, caring for pets, driving, and cleaning, "are not comparable to typical work activities." *Rogers*, 486 F.3d at 248. They can be done by the disabled and flexibly scheduled around a claimant's conditions, which might be worse at intermittent periods; work usually lacks this flexibility. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("The fact that appellant can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this appellant possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by appellant.").

Nonetheless, evidence of daily activities cannot be ignored. The Ruling Plaintiff relies on instructs ALJs to consider such evidence when formulating the RFC. SSR 96-8p, 1996 WL 374184, at *5. The listings the ALJ here analyzed at step three—where the bulk of her discussion of daily activities is found, (R. 9, PageID.41-42)—force consideration of this evidence when mental disorders are in play, as they are here. 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, §§ 12.04, 12.06 (Jan. 2017) (requiring analysis of the claimants' ability to manage themselves, which under § 12.00E(4) includes "maintaining personal hygiene and attire appropriate to a work setting"); *see also* 20 C.F.R. pt. 404, subpt. P, App. 1-Part-

A2, § 12.00C(3) (Jan. 2017) ("We will consider all relevant evidence about your mental disorder and your daily functioning that we receive from you and from people who know you. We will ask about your symptoms [and] your daily functioning . . . ."). Courts also credit this evidence. The Sixth Circuit, for example, upheld the credibility determination in *Cruse v. Commissioner of Social Security*, in part because of evidence the claimant washed dishes, did light cooking, bathed, attended church, visited friends, shopped, and did laundry. 502 F.3d at 542.

To keep from being whipsawed by these principles—*i.e.*, the need to analyze daily activities but not overemphasize them—ALJs must consider this evidence "with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Did the ALJ succeed at that here? For the following reasons, I suggest she did.

As noted, her discussion of daily activities was required at step three, and that is where she largely left it. (R. 9, PageID.41-42.) In her RFC analysis, the ALJ merely references the step three discussion of daily activities. (R. 9, Page.44.) And while daily activities displaying use of her hands and feet might not be highly probative, it lends at least some support to the ALJ's conclusion. *Cf. Batnz v. Berryhill*, 17-CV-00002-LRR, 2018 WL 3078111, at *4 (N.D. Iowa Feb. 22, 2018) ("Substantial evidence supports the ALJ's determination that the overall record, including treatment notes and Bantz's activities of daily living [including driving, shopping, laundry, loading the dishwasher, and preparing meal], is inconsistent with Bantz's complaints of more severe limitations in her left arm and hand."), *rep. & rec. adopted by* 2018 WL 1522693 (N.D. Iowa 2018); *Ceasar v. Comm'r of Soc. Sec.*, No. 1:12–cv–548, 2013 WL 3567040, at *11 (S.D. Ohio July 11,

24

2013) (upholding the ALJ's credibility determination, relying on evidence of daily activities to rebut complaints of hand problems), *rep. & rec. adopted by* 2013 WL 5177143 (S.D. Ohio Sept. 13, 2013). If Plaintiff had one fully functioning hand—she claims both grow numb, (R. 9, PageID.744)—this evidence might be less useful. *See Bowman v. Colvin*, 228 F. Supp. 3d 1121, 1136 (D. Ore. 2017) ("Her activities of cooking and limited computer use are not inconsistent with a restriction allowing for occasional use of the right hand with full-function of the left hand.").

The ALJ did not rely solely on daily activities, however. More importantly, she correctly observed that the objective evidence does not support Plaintiff's claims, which are consequently based on subjective complaints. (R. 9, PageID.44.) The record contains numerous physical examinations that failed to uncover any abnormalities with her neurological system or her extremities. *See, e.g.*, (R. 9, PageID.364, 367, 371-372, 434, 436.) In almost all, her strength and reflexes in her arms and legs were normal, as were her ranges of motion. (R. 9, PageID.322, 326-327, 359, 420, 432, 705, 719-720, 724-725, 729-730, 733-734, 738-739, 742-743, 746-747, 802-803, 812-813.) Often her gait and station were stable too, (R. 9, PageID.323, 327, 358, 747), although the gait could become wobbly, (R. 9, PageID.725, 734, 739, 743), and Dr. Giancarlo once diagnosed an undefined issue with it, noting "Gait and balance" under diagnoses, (R. 9, PageID.314.) A few examinations found reduction in her light-touch, pin prick, or vibration sensations, (R. 9, PageID.323, 327, 725, 730, 733-734, 738-739, 743, 747), but rarely if ever in all three sensation categories at one time and sometimes in none (R. 9, PageID.327, 332, 432), and her "motion and position sensation" in her arms and legs was usually intact, (R. 9,

25

PageID.747).

Swelling was rarely observed. (R. 9, PageID.332, 364, 426, 432, 434, 436, 720, 725, 729-730, 733, 742-743, 746, 803, 813 (no edema); *but see* R. 9, PageID.705 (left foot swollen), 819 (noting a foot MRI displaying diffuse soft tissue swelling around the ankle but no intrinsic abnormality).) After one of the few records finding swelling, the notetaker mentioned "[d]iscuss[ing] elevation of foot" and recommending Plaintiff elevate it. (R. 9, PageID.706, 711.) But that is the only medical advice about leg elevation in the record. Tellingly, her arm, wrist, and grip strength were repeatedly normal when tested. (R. 9, PageID.364, 725, 733, 738, 742, 746.) In fact, multiple reports, under the "Review of Systems" portion, show her denying numbness or swelling or difficulty walking. (R. 9, PageID.321, 325.)[12]

Thus, the objective evidence supports the ALJ's conclusion. While the records bears out some claims of numbness and gait issues, the vast majority of objective findings suggest no severe physical maladies. And none of the evidence says what functional

---

[12] The "review of systems" section in many reports denied problems, although at times this section was internally inconsistent with other statements in the same report. *See* (R. 9, PageID.331 (showing the review of musculoskeletal and neurological systems as "negative"), 358 (showing negative for leg swelling, back pain, and all other symptoms), 362 (negative for musculoskeletal pain, numbness, and tingling), 419 (negative for joint swelling, back pain, and numbness), 429 (negative for "gait disturbance, joint pain, [and] muscular weakness"), 544 (negative "Neuro/Psych" review), 705 (noting foot swelling but "negative" for back pain and numbness), 719 (denying that neurologic conditions negatively affected her home or social life or caused weakness, that she experienced muscle or joint weakness, that walking was difficult, or that her joints were swollen), 724 (claiming numbness and joint pain, but denying weak muscles or joints, difficulty walking, back pain, and joint swelling), 733 (denying joint pain, muscle or join weakness, difficulty walking, and joint swelling), 737 (denying all musculoskeletal and neurologic issues except fractures), 741-742 (denying all musculoskeletal and neurologic issues except headache), 745-746 (same).) Despite mostly consistent complaints about hand and foot pain and numbness, in a few records she reported that her physical functioning had improved and expressed optimism about the pain decreasing. (R. 9, PageID.717, 727.)

26

limitations might result from any of the conditions. Indeed, her strength, reflexes, range of motion, and grip were typically normal. These materials provided the ALJ ample support for his conclusion.

Pointing only to her self-reported complaints, Plaintiff protests that objective evidence is unnecessary. (R. 12, PageID.859 (citing R. 9, PageID.59, 316, 722, 731, 740, 800, 810, 812.).) And indeed, 20 C.F.R. § 404.1529(c)(2) (2017), promises claimants that their statements will not be rejected "solely because the available objective medical evidence does not substantiate [the] statements." One could quibble with whether the objective evidence here does more than simply fails to substantiate her complaints and actually contradicts them. In any case, just as those subjective statements cannot be rejected out of hand, they cannot by themselves establish disability. While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a).

Thus, the ALJ may not disregard the uncorroborated subjective complaints, SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996), and must instead consider the following factors:

    (i)    [D]aily activities;
    (ii)   The location, duration, frequency, and intensity of . . . pain;
    (iii)  Precipitating and aggravating factors;
    (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)   Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at \*3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at \*5 (July 2, 1996).

Plaintiff fails to address these factors or explain how the ALJ botched her analysis of them. Undeveloped arguments like this one verge on being deemed waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."). It is clear enough, however, that the ALJ adequately addressed the regulatory factors. Indeed, the thrust of Plaintiff's second argument is that the ALJ paid too much attention to daily activities. The ALJ also summarized Plaintiff's statements and considered the extent of Plaintiff's treatments. (R. 9, PageID.43.) The discussion could have been more thorough, but it is enough to show the ALJ appropriately accounted for the factors, especially given Plaintiff's failure to offer any developed argument to the contrary.

The final piece of her argument begins with the criteria in 20 C.F.R. § 404.1527 for evaluating medical source opinions. (R. 12, PageID.863.) She then attempts to apply those factors to the medical notes of Dr. Thomas Giancarlo, who she says: treated her for years, (*id.* (citing R. 9, PageID.314, 323)); "opined that his patient's upper and lower extremity symptoms had worsened," (*id.* (no citation to the record)); "noted that his patient had daily numbness and paresthesias, hand weakness, gait instability, and foot spasm," (*id.* (citing R. 9, PageID.740)); and noted various symptoms on four different appointments, (R. 12,

PageID.863-864 (citing (R. 9, PageID.706, 711, 722, 731, 734, 800, 802, 810, 812)).

Without more, she states, "It is submitted that the ALJ failed to properly evaluated [*sic*]

the reports of Dr. Giancarlo as required by 20 CFR Section 404.1527(d)." (R. 12,

PageID.864.)[13]

As with other arguments, Plaintiff does little to detail the flaws in the ALJ's

analysis—she does not, in fact, examine the decision at all in this section of her argument.

A more fundamental problem, however, is that while 20 C.F.R. § 404.1527 prescribes how

to analyze a medical opinion, Dr. Giancarlo never offered such an opinion. A "medical

---

[13] Tucked at the end of the second argument are the following two paragraphs:

> A vocational expert (VE) testified that all work would be precluded is [*sic*] an individual could use her upper extremities for grasping or gross manipulation only on an occasional basis [as opposed to frequent basis]. . . . The VE testified that a typical employer allows no more than one absence per month. All work would be precluded if an individual would be absent more than one day per month. . . . The prior decision found that Neal would be absent 3 or more days per month on an ongoing basis [during the time period that her impairments were severe]. . . .

> The VE testified at the current hearing, that based upon plaintiff's testimony provided at the hearing, she would not be able to place her in any full-time competitive employment. The primary preclusive reasons were her need to elevate the legs and her absenteeism. . . .

(R. 12, PageID.684 (citations to the record omitted).) These paragraphs float in an analytical void—it is unclear what Plaintiff is trying to articulate and how—with the exception of the first sentence—it relates to the core argument centering on grasping, fingering, fine/gross manipulation, and foot controls. The inference is that, because her hand and foot problems would require leg elevation and cause her to miss three or more days a month, she is precluded from employment. In other words, the paragraphs demonstrate the vocational consequences of her medical impairments. That is how I read this coda to the second argument. As such, it is relevant only to the extent she can prove that her impairments result in these limitations.

Similarly, Plaintiff cites SSR 96-9P, which states that "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." 1996 WL 374185, *8 (July 2, 1996). Again, however, this evidence speaks to the vocational inquiry rather than the medical limitations.

opinion" is a "statement about what you can still do despite your impairment(s) based on the acceptable medical source's findings." 20 C.F.R. § 404.1513(b)(6) (2016); *see also* SSR 96-5p, 1996 WL 374183, at *4 (quoting the regulation and stating that the medical source statement is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings"). None of Dr. Giancarlo's records contain statements opining on what Plaintiff could still do. Consequently, there was nothing to analyze under 20 C.F.R. § 404.1527.

With three exceptions, the records Plaintiff cites merely memorialize her complaints. (R. 12, PageID.863-864 (citing (R. 9, PageID.706, 711, 722, 731, 734, 740, 800, 802, 810, 812).) Records containing her own complaints do not form a solid basis for a medical opinion. *Cf. Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 257-258 (6th Cir. 2016) (noting that treating sources are not owed controlling deference if their opinions are based only on subjective complaints). The exceptions do not help her, either: the first two relate to a single episode when her left foot was swollen, and each simply note the swelling and need for foot elevation, (R. 9, PageID.706, 711); the last contains examination notes that mention her wobbly gait and reduced sensations, but also her normal strength (including grip) and reflexes, (R. 9, PageID.734).

Moreover, the only direct medical opinion on Plaintiff's physical limitations came from the state agency's reviewing medical professional, Dr. Alyce Metoyer, who adopted the prior ALJ's decision that Plaintiff's physical impairments were not even severe, let alone disabling. (R. 9, PageID.114.) The ALJ here thought that opinion was too parsimonious. (R. 9, PageID.44.) Yet because of its parsimony, it adds support for rejecting

any opinions that might lurk in Dr. Giancarlo's notes and declining to find Plaintiff disabled. Consequently, Plaintiff's argument regarding Dr. Giancarlo is unpersuasive.

For these reasons, I conclude that substantial evidence supports the ALJ's conclusions about Plaintiff's hand and feet impairments.

### 3.     Mental and Emotional Limitations

Plaintiff's last argument takes stab at undermining the ALJ's step-three analysis and also more broadly attacks the RFC's treatment of her mental limitations. (R. 12, PageID.865-866.) She does not, however, cite any of the listings the ALJ considered. Rather, she claims that the hypotheticals to the VE did not include any "concentrational limitations" and the decision "does not contain any discussion concerning the amount of time that plaintiff would be off task." (R. 12, PageID.865.) The remainder of her step-three contentions are as follows:

> The ALJ failed to properly assess the plaintiff's mental limitations pursuant to 20 CFR Section 404.1520a which requires an evaluation of the individual's ability to sustain work, using appropriate production standards, in either real or simulated work tasks, e.g., task completion within acceptable time periods.
>
> [She then quotes 20 C.F.R. § 404.1520a(c)(2)] . . . .
>
> The current decision does not contain rationale for the "B" criteria rating using the special technique described in 20 CFR Section 404.1520a. The ALJ's decision fails to state how it was determined that plaintiff had an ability to perform simple, routine, repetitive tasks.

(R. 12, PageID.865-866.) Next, her entire argument against the RFC is this:

> The residual functional capacity delineated in Finding #5 does not contain a function-by function [*sic*] assessment of the claimant's ability to do work-related mental activities. Social Security Ruling 85-15 provides that activities generally required by competitive, remunerative work are the

31

abilities to: understand, carry out and remember instructions;

use judgment in making work-related decisions;
respond appropriately to supervision, co-workers and work situations;
deal with changes in a routine work setting;

(R. 12, PageID.866.)[14]

As a global matter, Plaintiff's arguments are cursory and conclusory. She fails to engage or even cite evidence concerning her mental limitations. And her RFC argument literally and figuratively trails off, without ending punctuation to put it to rest. At the very least, the lack of detail means her arguments provide nothing to counter the possibility that, even if the ALJ erred, the flaws were harmless.

Turning to the listing argument, the ALJ considered two possibilities: listing 12.04 and 12.06. (R. 9, PageID.41-42.) The former is the listing for depressive and bipolar disorders. 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.04 (Jan. 2017). To meet it, the claimant must present medical documentation satisfying various requirements in § 12.04A ("A criteria"), which are not relevant here. In addition, the claimant must establish either criteria in either § 12.04B ("B criteria") or § 12.04C ("C criteria"). The same "B criteria" appear in § 12.06B, which deals with anxiety and obsessive-compulsive disorders. Because Plaintiff challenges only the "B criteria," I will focus on that aspect of the listings.

Listings § 12.04B and § 12.06B provide:

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).

---

[14] The formatting is as it appears in the brief.

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, §§ 12.04B, 12.06B (Jan. 2017). "Extreme limitation" means an inability to "function in [an] area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(e) (Jan. 2017). A "marked limitation" is one in which the claimant's ability to function in an area "independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(d) (Jan. 2017). A "moderate limitation," by contrast, leaves the claimant with "fair" functioning "independently, appropriately, effectively, and on a sustained basis . . . ." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(c) (Jan. 2017).

The four specific "B criteria" "areas" are also defined. First, "[u]nderstand, remember, or apply information . . . . refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(1) (Jan. 2017). Second, "[i]nteract with others . . . refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2) (Jan. 2017). Third, "[c]oncentrate, persist, or maintain pace . . . refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(3) (Jan. 2017). Fourth, "[a]dapt or manage oneself . . . refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, §

12.00E(4) (Jan. 2017).

In addition to these provisions, 20 C.F.R. § 404.1520a tells claimants that the Commissioner will also use a "special technique" when evaluating the listings. Plaintiff mentions only one part of this technique, 20 C.F.R. § 404.1520a(c)(2), which explains that a claimant's "ability to function independently, appropriately, effectively, and on a sustained basis" depends on "such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function." *See also Kramer v. Soc. Sec. Admin.*, No. 08–15198, 2010 WL 451055, at *11-12 (E.D. Mich. Jan. 28, 2010) (explaining the full "special technique" in detail). The "technique" applies to steps two and three of the ALJ's sequential evaluation, not to the development of the RFC in the later stages. *Erbland v. Comm'r of Soc. Sec.*, No. 1:13–CV–93, 2015 WL 5578020, at *4 (W.D. Mich. Sept. 22, 2015).

The ALJ complied with listing requirements and the "special technique." She reviewed and rated each functional "area," giving reasons for her conclusions. (R. 9. PageID.41-42.) Regarding "understanding, remembering, or applying information," the ALJ assessed moderate limitations because no evidence suggested more extreme limitations, Plaintiff could maintain her home, and she could drive and shop. (R. 9, PageID.41.) As for "interacting with others," the ALJ again rated Plaintiff's limitations as moderate because she shopped, her anxiety had recently been controlled, and her performance at the hearing was normal. (*Id.*) Likewise, Plaintiff had only moderate limitations in concentrating, persisting, or maintaining pace because she continued to do

34

household chores and could read and watch television. (*Id.*) As with the other areas, Plaintiff had moderate limitations in "adapting or managing oneself" because she continued to do housework, drive, shop, and handle self-care. (R. 9, PageID.42.) Thus, the ALJ complied with the regulatory framework, contrary to Plaintiff's argument.

Are her conclusions within that framework supported by substantial evidence? Alone, the above analysis is somewhat thin. The concentration and persistence area, in particular, would appear to read too much into daily activities that bear little resemblance to remunerative work; and, even at that, Plaintiff stated she struggled with recalling what she read. (R. 9, PageID.238.) But the ALJ supplemented her analysis of mental limitations in the RFC discussion, offering a more detailed examination of the evidence. (R. 9, PageID.43-44.) She added to her prior analysis by recounting Plaintiff's complaints of anxiety and depression, but also noting evidence of improvement, records demonstrating no issues, the "highly subjective" nature of Plaintiff's evidence, the lack of "extensive exacerbations or the need for recurrent emergency room visits," and that Plaintiff's problems appeared to be related to her alcoholism (which, the ALJ did not note, Plaintiff claimed to have overcome at the hearing an in the medical records, (R. 9, PageID. )). (R. 9, PageID.44.)

In addition, the ALJ noted the reviewing psychologist's opinion—the only medical opinion directly addressing discrete functional limitations—that Plaintiff's mental impairments were not even severe. (R. 9, PageID.44; *see also* R. 9, PageID.115.) The psychologist examined both listings 12.04 and 12.06 and found only mild limitations in the "B criteria." (R. 9, PageID.115.) He opined that no material changes had occurred since

the last ALJ decision. The ALJ thought the evidence supported more restrictive limitations, but not so much that Plaintiff was disabled. (R. 9, PageID.44.)

Once again, these additional rationales are uneven. Some are clearly lackluster, like Plaintiff's lack of multiple hospitalizations. That she can get by without involuntary confinement does not mean she can work. The ALJ's diagnosis linking the mental problems to alcoholism, although perhaps full of common sense, nonetheless is the sort of psychological assessment that ALJs are not fit to make. *See Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong."). Plus, the statement is in tension with the ALJ's conclusion in the preceding paragraph that "[a]lthough the claimant reported using alcohol as a coping mechanism for anxiety, her long history of alcohol abuse undermines any clear evidence of cause and effect." (R. 9, PageID.44.)

On the other hand, the evidence of daily activities provides some evidence supporting the ALJ, although perhaps not enough alone to reject Plaintiffs claims. The reviewing psychologist's opinion also supports the ALJ's decision. *See* 20 C.F.R. § 404.1527(e) (subjecting DIB claims to the rules in 20 C.F.R. § 416.913a(e)(2), which states that "psychological consultants are highly qualified and experts in Social Security disability evaluation" whose opinions the ALJ must consider).

What ultimately convinces me that substantial evidence backs the ALJ's decision— or that any error is harmless, *see Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 657 (6th

Cir. 2009) (applying harmless error to the "special technique" in 20 C.F.R. § 404.1520a)—
is the relative lack of objective evidence favoring Plaintiff and her failure to address the
evidence or demonstrate additional functional limitations that it could support. *Cf. Essary
v. Comm'r of Soc. Sec.*, 115 F. App'x 662, 667 (6th Cir. 2004) (rejecting plaintiff's
argument because she "failed to present evidence of any functional limitations resulting
specifically from her obesity"). The record, in fact, contains scarce evidence that could
enable Plaintiff to meet a listing or have a highly restrictive RFC. And hardly any of it
bolsters her present suggestions that she struggles to concentrate or follow instructions. To
the contrary, the evidence discussed below offers proof that Plaintiff's capabilities in these
areas and others were normal.[15]

Turning to the record, many of the non-counseling reports include psychiatric
evidence. In these, while Plaintiff sometimes claimed depression or anxiety—but rarely
did she claim to experience both at once and she often *denied* experiencing one or the other.
*See* (R. 9, PageID.318, 322, 742, 746 (denying anxiety), 737 (denying depression); *but see*
R. 9, PageID.729, 812 (claiming depression, nervousness, anxiety, and panic attacks), 802
(claiming depression, anxiety, and panic attacks).) She sometimes denied both depression
and anxiety. (R. 9, PageID.326, 719, 724, 734; *see also* R. 9, PageID.331, 510, 544 (listing
"negative" in the psychiatric portion of the review of systems), 358, 419, 705 (listing in the
psychiatric section that Plaintiff was not confused), 429 (denying memory loss).) Other

---

[15] It is noteworthy, as well, that under *Earley*, 893 F.3d at 931, the ALJ was entitled to be "mindful" of the
prior ALJ determination that Plaintiff's mental impairments were not even severe by April 24, 2014. (R. 9,
PageID.103-104.)

times the "review of systems" simply noted her history of depression and anxiety, without making any current complaints, (R. 9, PageID.362, 429, 544), while others mention a diagnosis of depression without explanation, *see, e.g.*, (R. 9, PageID.365).

Moreover, throughout this batch of records she underwent numerous "mental status" and psychiatric examinations, all of which demonstrated proper orientation, normal language abilities, normal attention and concentration, intact short- and long-term memory, ability to follow multi-step commands, appropriate fund of knowledge, and normal mood. (R. 9, PageID.318-319, 322-323, 326, 725, 734, 738, 742, 746) Some of these tests were elaborate, asking Plaintiff to recall multiple items, recent events, and remote memories. (R. 9, PageID.326, 725, 734, 738, 742, 746; *see also* R. 9, PageID.364 (noting intact recent and remote memory).) Other non-counseling medical records include examinations finding normal mood, affect, judgment, thought content, or orientation, (R. 9, PageID.332, 359, 366, 372, 420, 426, 434, 436, 439, 705, 725, 734, 738, 742, 746), at times even noting that Plaintiff was not nervous or anxious. (R. 9, PageID.359, 705). None of this evidence indicates that Plaintiff struggled with concentration, attention, memory, following instructions, or similar issues.

The records from counseling sessions provide more detail but are still unhelpful for Plaintiff. Most if not all include her complaints of depression or anxiety, (R. 9, PageID.569, 583, 593, 605, 616-617, 626, 652, 676, 696, 750, 754, 760, 769, 783), or of lack of concentration, (R. 9, PageID.593, 605, 616, 628, 676, 754, 769), and often her mood was noted as depressed and/or anxious, hypomanic, or labile, (R. 9, PageID.573, 588, 593, 642, 648, 664, 699, 751, 759, 787, 825, 829). But almost all the remaining findings in the mental

status examination were normal, including remote and recent memory, orientation, attention, concentration, language, deportment, through processes, and/or appearance, with at least fair judgment and insight. (R. 9, PageID.573, 588, 593-595, 608-609, 632-633, 637, 642, 643-644, 647-650, 652, 654-655, 659-662, 664-666, 670-673, 676, 678-679, 685-686, 692-693, 699-700, 750-752, 758-759, 769-769, 787, 825-827, 829-831.)[16] And sometimes her mood was normal, or the depression or anxiety "mild" or "very mild" and occasional. (R. 9, PageID.608, 632-633, 637-639, 649, 654, 659, 660, 665, 671, 672, 692, 769.) On one occasion she expressed the desire to finish school and "provide for her children." (R. 9, PageID.619.) Medications occasionally helped the depression and anxiety, (R. 9, PageID.652, 689, 825), but not always, (R. 9, PageID.682, 750.) Other counseling reports concluded that she had "[n]o inability to form relationships." (R. 9, PageID.639, 649, 660, 672.)

At the rehabilitation center in 2015, Plaintiff's thinking and orientation were normal, but the intake form appears to suggest (without explanation) a "generalized deficit" in her

---

[16] The records from the Christian Counseling Center have one aspect that needs mentioning. A few of the examination categories—in particular, "Speech and Language" and "Thought Process"—consist of various boxes the counselor is to "[c]heck if normal." (R. 9, PageID.826.) For example, the boxes under "Thought Process" are as follows: "Rate of Thought," "Content of Thought," "Associations," "Processes," "Abstraction," and "Computation." (*Id.*) On many occasions, most but not all of these boxes were checked. At the September 30, 2016 session, for instance, all the boxes were checked for "Speech and Language" but under "Thought Process" the boxes for "Rate of Thought" and "Associations" were unchecked. (*Id.*) This same marking sequence appeared at other sessions. *See, e.g.*, (R. 9, PageID.588, 751, 759.) Other times the "Rate" box under "Speech and Language" was unchecked. (R. 9, PageID.594.)

Because the majority of boxes in these two categories were always checked, including the seemingly significant ones such as "Processes" and "Content of Thought," and no abnormalities were flagged or described, I consider the overall results for the "Thought Process" to be normal. Plaintiff does not argue otherwise or suggest that the unchecked boxes reflect significant abnormalities; she does not address the evidence at all in her analysis.

memory, the only possible objective record of such a problem. (R. 9, PageID.794.) More recent reports from 2016, after Plaintiff stopped drinking, indicate less depression, (R. 9, PageID.769), and on a few occasions she denied having depression or sadness, (R. 9, PageID.825, 829.) Finally, no medical source opined that Plaintiff had any general or particular functional limitations.[17]

In sum, the medical record simply does not contain evidence, substantial or otherwise, that supports Plaintiff's current questioning of the ALJ's decision. Without citation to supporting law or facts, Plaintiff states that the ALJ failed to give a function-by-function account of effects of her mental impairments. (R. 12, PageID.866.) Yet, the ALJ did just that in the listing analysis. (R. 9, PageID.41-42.) The followed the prescribed steps and discussed the relevant complaints. There was no other contrary evidence the ALJ could have grappled with; in fact, the ALJ could have further supported her reasoning by citing the many instances when Plaintiff denied depression or anxiety. And the objective evidence largely contradicts the apparent, but unstated, premise of Plaintiff's argument that had the ALJ been more thorough she would have found evidence of poor mental and emotional functioning. To the contrary, the records above demonstrated normal memory,

---

[17] Various Global Assessment of Functioning (GAF) scores appear in the record with results that could indicate moderate or severe problems with social functioning. *See, e.g.*, (R. 9, PageID.574, 590, 616, 641.) The ALJ explained that GAF scores do not correlate with the mental disorder listings, and he declined to give them much weight. (R. 9, PageID.44-45.) Plaintiff's brief does not mention the GAF scores—at most, her fact section appears to indirectly refer to the results of the GAF score, *e.g.*, that she had moderate problems, without mentioning the GAF score itself. (R. 12, PageID.854-855.) The ALJ was correct that GAF scores have dubious value; reliance on them has frequently been called into question *see Spuhler v Colvin*, No. 2:13-CV-12272, 2014 WL 4855743, at *16 (E.D. Mich., June 17, 2014) (discussing caselaw), *Rep. & Rec. adopted in relevant part by* 2014 WL 4856153 (E.D. Mich. Sept. 30, 2014), and the leading diagnostic treatise now rejects their use, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013). I find no error in the ALJ's analysis.

concentration, language, thought processes, and the like.

Consequently, it is not clear how the ALJ's listing analysis could have been augmented by evidence favoring Plaintiff; the only additions would have been further citations to the record to supporting the ALJ's conclusion. For the same reasons, Plaintiff's RFC argument should fail. She has not assessed the evidence or suggested additional limitations that should have been incorporated into the RFC. And the evidence described above, would not support such limitations.[18] In particular, the consistent assessments of Plaintiff's normal attention and concentration do not offer any support for off-task time, nor does any evidence suggest the possibility of absenteeism. The ALJ did not err by failing to incorporate restrictions on these matters.

In any event, I would conclude that any errors in the ALJ's listing or RFC analyses were harmless. She has not demonstrated that the alleged errors prejudiced her on the merits or deprived her of substantial rights. *See Rabbers*, 582 F.3d at 654 (noting the court does not remand for noncompliance with procedural rules absent prejudice or deprivation of substantial rights). To assess prejudice in "B criteria" errors,

> a reviewing court need only ask whether the record indicates that the claimant's mental impairment would have ultimately satisfied the B criteria. This kind of evidence—evidence regarding the claimant's activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation—is objective, concrete factual and medical evidence that will be apparent in the record, at least in some cases.

---

[18] Plaintiff's citation to SSR 85-15, 1985 WL 56857 (Jan. 1, 1985) does not change this conclusion. That Ruling concerns how to assess whether a person with mental impairments and who does not meet or equal a listing can do other work at step five. *Id.* at *1. Plaintiff does not explain how it is relevant here, nor can I discern any meaningful relevance.

*Id.* at 657. Plaintiff has not discussed the evidence or how it would ultimately satisfy the "B criteria." As detailed above, the record contains little objective support for Plaintiff and significant evidence against her claims. Consequently, if the ALJ's listing analysis erred, I would suggest it was harmless. Likewise, Plaintiff has not addressed evidence supporting more severe restrictions in the RFC, *cf. Essary*, 115 F. App'x at 667, and again the evidence does not suggest any such restrictions. As a result, I suggest she was not prejudiced by any error.

In light of the above, I conclude that the ALJ's analysis of Plaintiff's mental impairments satisfied the regulations and was supported by substantial evidence; any errors were harmless.

### H.   Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (R. 12), **GRANTING** the Commissioner's Motion, (R. 17), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 31, 2019

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 31, 2019

By s/Kristen Castaneda
Case Manager